NEW JERSEY STATE POLICEMEN'S BENEVOLENT ASSO-
CIATION, LOCAL #16 (EAST ORANGE P.B.A.) PLAIN-
TIFF, v. CITY OF EAST ORANGE, A MUNICIPAL COR-
PORATION OF THE STATE OF NEW JERSEY, THOMAS
COOKE, IN HIS CAPACITY AS MAYOR OF EAST
ORANGE AND THE CITY COUNCIL OF THE CITY OF
EAST ORANGE, DEFENDANTS.

Superior Court of New Jersey
Chancery Division

Decided November 16, 1978.

*Mr. Lawrence A. Whipple, Jr.* for plaintiff (*Messrs. Zazzali, Zazzali & Whipple,* attorneys).

*Mr. Jacob Green,* attorney for defendants.

*Mr. Daniel P. Reynolds,* Deputy Attorney General, *amicus curiae* (*Mr. John J. Degnan,* Attorney General of New Jersey, attorney).

DWYER, J. S. C. By verified complaint and order to show cause, New Jersey State Policemen's Benevolent Association, Local #16 (PBA) instituted this action under *N. J. S. A.* 2A:24–7 and *N. J. S. A.* 24:13A–19 for confirmation of the arbitrator's award granting pay increases to members of police department aggregating $228,650 for 1978 and $271,494 for 1979 against the City of East Orange, a municipal corporation existing under the laws of New Jersey, Thomas Cooke in his capacity as Mayor, and the members of the City Council of East Orange. The award was made pursuant to the provisions of the New Jersey Employer-Employee Relations Act added by *L.* 1977, *c.* 85, establishing that compulsory binding arbitration shall be used to resolve impasses in negotiations for contracts between fire and police departments and municipalities. *N. J. S. A.* 34:13A–14 *et seq.*

Complaint alleges that PBA and East Orange were parties to a collective bargaining agreement; that on or about November 15, 1977 negotiations commenced for a successor agreement, and that on December 15, 1977 it became apparent an impasse existed. PBA, pursuant to *N. J. S. A.* 34:13A–16, notified the Public Employment Relations Commission (PERC) of that impasse and requested the appointment of an arbitrator to resolve the impasse. By agreement, the arbitrator was to use conventional arbitration and the contract was to be for the years 1978 and 1979.

The complaint further alleges that the arbitrator was appointed on December 22, 1977 and that hearings were held on January 25, March 20 and 28, May 15 and 26, 1978, and that the award was made July 14, 1978. The complaint concluded in paragraph 10 that the award was not being

implemented by defendants. It sought confirmation of the award and counsel fees.

An answer was filed on behalf of all defendants admitting all allegations except those in paragraph 10. It asserted that the noneconomic award was implemented but asserted that the economic award cannot be implemented without violating the provisions of *N. J. S. A.* 40A:4–45.1 *et seq., L.* 1976, *c.* 68, as amended ("Cap Law") and *N. J. S. A.* 40A:4–57, a section of the Local Budget Law prohibiting expenditures in excess of appropriations included in the budget.

East Orange alternatively sought to have the award either vacated under *N. J. S. A.* 2A:24–8 and under *N. J. S. A.* 34:13A–16(f)(5) on the grounds that the award was procured by undue means in that the arbitrator ignored the legal inability of East Orange to meet the award or that the award be held not subject to the Cap Law under *N. J. S. A.* 40A:4–45.3(g) providing an exemption for "Expenditures mandated after the effective date of this act pursuant to State and Federal law."

East Orange submitted a copy of its budget and affidavits from its comptroller detailing the computation of the Cap limit for 1978 and projected for 1979, the status of negotiations with other employees and the generally poor state of its fiscal affairs in 1978 and projected for 1979. The conclusion to be inferred is that if the police absorbed the $236,201 in the budget for salary increases for 1978, then no other employees could receive any increases above normal increments because of the Cap Law.

On the return date both parties urged that the court determine that the exemption under *N. J. S. A.* 40A:4–45.3(g) applied so that the increase could be paid and no problem would be encountered with the Division of Local Government Services, which has indicated that the Cap Law applied. There did not appear to be an adverse position between the parties on this issue. The court adjourned the matter to permit the Attorney General to submit a brief *amicus curiae* on

442

the construction of the Cap Law. The Attorney General has appeared *amicus curiae* for John Laezza, Director, Division of Local Government Services, and has filed a brief stating that the Cap law does apply.

The basic question is whether the arbitrator's award should be confirmed. To answer this question in light of East Orange's position, it is first necessary to understand the interrelationship of *N. J. S. A.* 34:13A–1 *et seq., L.* 1968, *c.* 303, *N. J. S. A.* 34:13A–14 *et seq., L.* 1977, *c.* 85, the Local Budget Law, *N. J. S. A.* 40A:4–1 *et seq.* and the Cap law.

PBA and East Orange urge that the legislative history of the Compulsory Interest Arbitration Act, *L.* 1977, *c.* 85, enacted after the Cap Law, shows that the Legislature did not intend that awards under it should be subject to the limits imposed upon local budgets by the Cap Law. They point out that the version of the bill as passed by the Senate contained, in what is now found in *N. J. S. A.* 34:13A–16(g) (criteria to be employed by arbitrator), the following additional language:

> (i) The arbitrator shall not issue any finding, opinion, or order which shall impose any fiscal obligation on any municipality, county, fire prevention district, or the State, or any agency thereof, which shall cause by itself or in conjunction with decisions of other arbitrators, any such governmental unit to exceed the limit of any law which imposes spending or budgetary restrictions on such governmental unit.

However, they show that the Assembly deleted the language. Thereafter, the Senate passed the bill in the form previously passed by the Assembly. The Governor subsequently signed the bill.

The inquiry into the legislative history of the Compulsory Interest Arbitration Law must be broader. The Public Employer-Employee Relations Study Commission Report to the Governor and the Legislature, dated February 2, 1976 (Report), is the beginning point.

The Report starts with a review of *L.* 1968, *c.* 303, *N. J. S. A.* 34:13A–1 to 13. In 1968 the Legislature authorized collective bargaining between public employers and public employees, and established certain unfair labor practices. It also authorized an agency to assist the collective bargaining process by providing mediation and factfinding services to the parties in the event of an impasse. It gave the agency rulemaking power. *N. J. S. A.* 34:13A–5.4(e) states:

> The commission shall adopt such rules as may be required to regulate * * * the time of commencement of negotiations and of institution of impasse procedures so that there will be full opportunity for negotiations and the resolution of impasses prior to required budget submission dates.

There was no provision for compulsory arbitration to resolve an impasse to meet a budget submission date. *Cf. N. J. S. A.* 34:13A–6(b). The Commission did promulgate a rule that required negotiations for a new or successor contract to commence at least 120 days in advance of the public employer's required submission date. *N. J. A. C.* 19:12–2.1. The Commission in *N. J. A. C.* 19:12–1.1, after referring to the statute quoted above, stated:

> * * * Accordingly, the provisions of this chapter establish a mandatory time period for the commencement of negotiations, utilizing the public employer's required budget submission date as a definitive reference point to afford the parties a full opportunity for negotiations and resolution of impasses which are reached prior to the required budget submission date and for utilization of impasse procedures for parties who reach impasse during alternative time periods.

The reference to "alternate time periods" covers the situation where the parties agree to a different period of negotiation, as permitted under *N. J. A. C.* 19:12–2.1(a). Since the statute mandates completion of negotiations and resolution of impasses "prior to the required budget submission dates," *N. J. S. A.* 34:13A–5.4(e), the alternative time period provision in the rule cannot be construed as permitting

the parties to agree on a time frame that will continue beyond the required budget submission date.

The Local Budget Law sets the date for the introduction and adoption of the budgets for municipalities. *N. J. S. A.* 40A:4–5 and 10. The budget must be introduced by the governing body not later than February 10 of the fiscal year. Subject to exceptions not germane to the issues herein, the governing body must adopt the budget by March 25 of the fiscal year.

The Faulkner Act, in *N. J. S. A.* 40:69A–46, provides that under certain of the forms of municipal government provided for therein the mayor must submit a proposed budget to the governing body by January 15 of the fiscal year.

The New Jersey Public Employment Relations Commission (PERC) now administers the law for public employment, *N. J. S. A.* 34:13A–3(b), 5.2, and has rulemaking power for public employment, *N. J. S. A.* 34:13A–11. It has instituted procedures under which it establishes the required budget submission date for each municipality. This avoids disputes as to what dates to use.

The Study Commission recognized in its Report (at 24) that budget laws were a factor to be considered. In the draft of the legislation it proposed in the Report, the Study Commission (at 96) adhered to the concept of requiring resolution of the impasse prior to the required budget submission date. The Study Commission recommended compulsory arbitration for the final resolution of impasses in collective bargaining for all public employees.

The Legislature chose to make compulsory arbitration applicable only to fire and police personnel, *N. J. S. A.* 34:13A–15, 16. The court notes that our Supreme Court has held compulsory arbitration constitutional as a means of resolving impasses when applied to the public sector. *Div. 504 Amalgamated Transit Union v. Mercer Cty. Improvement Auth.,* 76 *N. J.* 245 (1978). A number of other states have adopted compulsory arbitration statutes applicable to less than all public employees. The highest courts of those states

have upheld such statutes against attack on the ground that the class is unreasonable and the legislation violates home rule of local governments. See Annotation, "Validity and Construction of Statutes or Ordinances Providing for Arbitration of Labor Disputes Involving Public Employees," 68 *A. L. R.* 3d 885 (1976), particularly *Dearborn Fire Fighters v. City of Dearborn,* 394 *Mich.* 229, 231 *N. W.* 2d 226 (Sup. Ct. 1975); *City of Amsterdam v. Helsby,* 37 *N. Y.* 2d 19, 371 *N. Y. S.* 2d 404, 332 *N. E.* 2d 290 (Ct. App. 1975). The court determines that the statute is at least facially valid.

The Legislature retained the reference to the public employer's required budget submission date in *N. J. S. A.* 34:13A–16(d) and (f) in respect to notifying PERC of an impasse, 60 days before required budget submission date, notifying PERC of the inability to agree upon a procedure to resolve it, 50 days before required budget submission date.

By *L.* 1977, *c.* 85, the Legislature added the compulsory arbitration provisions to *L.* 1968, *c.* 303. It did not write a new rulemaking power provision for PERC. It made the existing rulemaking power, including *N. J. S. A.* 34:13A–5.4(e), applicable to PERC. *N. J. S. A.* 34:13A–11.

██ The court concludes that the Legislature not only intended but expressly stated that PERC was to issue rules to regulate impasse resolution procedures so that impasses would be resolved prior to required budget submission dates.

PERC has adopted rules that require governmental units, where compulsory arbitration may be invoked, to commence negotiations at least 150 days before the public employer's required budget submission date. *N. J. A. C.* 19:16–2.1. This is 30 days earlier than the date for commencing negotiations where voluntary negotiations prevail.

Using the budget introduction date of February 10 as the latest possible date, the latest date that negotiations should commence should be September 10 of the preceding year. This allows 90 days for negotiations to reach a voluntary settlement. It also allows at least 50 days for an arbitrator to reach a compulsory result.

If this framework is adhered to, then the governing body and the taxpayers have the result available during the normal period for consideration at public hearings on the budget. It enables the decision makers to determine whether to cut other personnel, to reduce the number of fire and police personnel, or to raise taxes in years when no consideration need be given to the Cap Law.

East Orange has suggested the provision in *N. J. S. A.* 34:13A-9 that

> \* \* \* The commencement of a new public employer fiscal year after the initiation of arbitration procedures under this act, but before the arbitration decision, or its enforcement, shall not be deemed to render a dispute moot, or to otherwise impair the jurisdiction or authority of the arbitrator or his decision \* \* \* \*,

indicates that the Legislature recognized that an award might be rendered after the budget was adopted; hence, it would be exempt from the Cap Law. In essence, it would be enforced in a manner analogous to a money judgment against a municipality, *i. e.,* carried into the next year's budget. See *N. J. S. A.* 40A:4-32(e) and Division of Local Government Budget Manual.

The court does not accept this construction. Because of the impact of the real estate tax laws and the Local Budget Law, most municipalities operate on a January 1 to December 31 budget year. *N. J. S. A.* 40A:4-19 authorizes temporary appropriations not exceeding 25% of the preceding budget and debt service for the period up to budget adoption. The adoption of the budget at the end of March does not start a new fiscal year. The fiscal year starts January 1.

Under the time framework set forth by the Legislature, negotiations and compulsory arbitration begin in the year preceding the fiscal year in which the award will be reflected in the budget. PERC recognizes this in its rule. See *N. J. A. C.* 19:16-2.1. Since many compulsory arbitration proceedings may begin in December of the preceding fiscal year and carry

over into January or February for the award, two different legislative or governing bodies may be involved.

■ There is a rule of law that the acts of one legislative body are not binding on another legislative body. 72 *Am. Jur.* 2d, *States,* § 40. The public employer is required to file a final offer before arbitration begins under *N. J. S. A.* 34:13A–16(f)(1). The court concludes that the purpose of this provision is to prevent the arbitration process from being disrupted by a change in the membership of the governing body if it attempts to change the whole situation under the abovementioned rule of law.

If the suggestion of East Orange were adopted, the amount of the award for budget decision making would not be considered until the second budget period following the commencement of negotiations. The money, however, would have to be spent in the first budget period following commencement of negotiations. This result is at variance with the strong policy of the Local Budget Law requiring annual budgets to be on a cash basis.

The record establishes that negotiations did not commence until November 17, 1977. This was 95 days in advance of the budget introduction date. The record does not show what PERC established as the budget submission date. The November 17 date is after the date that PERC set by rule. But the new rule was not effective until September 16, 1977. See 9 *N. J. Reg.* 350(a), 9 *N. J. Reg.* 497(a). Although the court notes that the parties commenced negotiations even after the date set for voluntary negotiations, the court concludes that it must consider the fact that the law and rule were first effective in 1977.

As stated above, the Report recommended that all public employees be included under compulsory arbitration. If this had been done, it would have included about 75% of all costs supported by municipal tax levies. Under such circumstances it would have been difficult to conclude that the Legislature intended arbitrators' awards to be excluded from the Cap Law.

PBA and East Orange urge that awards for fire and police salary increases are exempt from the Cap Law.

The purpose of the Cap Law is set forth in *N. J. S. A.* 40A:4-45.1. It states:

> It is hereby declared to be the policy of the Legislature that the spiraling cost of local government must be controlled to protect the homeowners of the State and enable them to maintain their homesteads.
>
> At the same time the Legislature recognizes that local government cannot be constrained to the point that it is impossible to provide necessary services to its residents.

The Legislature recognized that the two objectives of the statute might be at cross purposes. It declared the statute to be experimental and would be in effect for the tax years 1977, 1978 and would expire December 31, 1979. See notes to *N. J. S. A.* 40A:4-45.1.

The tax rate of East Orange makes the Cap Law applicable. *Cf. N. J. S. A.* 40A:4-45.2.

*N. J. S. A.* 4A:4-45.3, in relevant part, provides:

> In the preparation of its budget a municipality shall limit any increase in said budget to 5% over the previous year's final appropriations subject to the following exceptions:
>
> \*　　\*　　\*　　\*　　\*　　\*　　\*　　\*
>
> (c) An increase based upon an ordinance declaring an emergency situation according to the definition provided in *N. J. S. A.* 40A: 4-46 approved by at least two-thirds of the governing body and approved by the Local Finance Board; provided, however, that all such emergency authorizations shall not exceed, in the aggregate, 3% of current and utility operating appropriations made in the budget adopted for that year, and provided further that nothing herein provided shall be applicable to any emergency appropriation resolution adopted pursuant to *N. J. S. A.* 40A:4-46 for a purpose referred to in d. or j. below;
>
> \*　　\*　　\*　　\*　　\*　　\*　　\*　　\*
>
> (e) Amounts required for funding a preceding year's deficit;
>
> (f) Amounts reserved for uncollected taxes;
>
> (g) Expenditures mandated after the effective date of this act pursuant to State or Federal law.
>
> \*　　\*　　\*　　\*　　\*　　\*　　\*　　\*
>
> (i) When approved by referendum.

The Attorney General urges that the legislative purpose must be found not only in this act but in the package of laws that were enacted with it.

In order to fund the decision and mandate in *Robinson v. Cahill,* 70 *N. J.* 155, further proceedings, 70 *N. J.* 464 (1976), the Legislature enacted the New Jersey Gross Income Tax, *N. J. S. A.* 54A:1–1 *et seq.,* but this act was conditioned upon the enactment of what is popularly called the "income tax package." Among these laws are the State Cap Law, *N. J. S. A.* 52:9H–5 *et seq., L.* 1976, *c.* 67, limiting state spending, and the Local Government Cap Law, *N. J. S. A.* 40A:4–45.1 *et seq., L.* 1976, *c.* 68, amended, *L.* 1977, *c.* 10, limiting municipal and county spending. These laws were enacted the same day. A separate statute, *N. J. S. A.* 18A:7A–25, limits spending by boards of education. The purpose of these laws is not only to restructure the tax system by shifting part of the burden from real property taxes to income taxes but to assure that there will not be an undue increase in real estate taxes, particularly upon the homeowner.

The Attorney General further argues that the municipalities were authorized to provide police and fire protection by paid forces prior to the adoption of the Cap Law. See *L.* 1917, *c.* 152. He further notes that the cost for such protection in East Orange is 35% of the budget and suggests that the same percentage of the budget is spent for these purposes in the larger urban centers where the tax burden is the greatest.

The Attorney General urges that the exception in *N. J. S. A.* 40A:4–45.3 (g) should apply only to state and federal programs enacted after the effective date of the Cap Law. The parties urge that *L.* 1977, *c.* 85, should be construed to be such a law because it was enacted after the effective date of the Cap Law, and that it imposes costs through binding arbitration.

For purposes of deciding this matter, this court does not have to decide the question as to the meaning of "law" in

*N. J. S. A.* 40A:4–45.3(g). *Cf. Clark v. Degnan,* 163 *N. J. Super.* 344 (Law Div. 1978), at § IV.

Under *N. J. S. A.* 34:13A–1 *et seq.* other public employees and the public employer are under a duty to bargain in good faith and to have the results available at budget submission time. No one has suggested that all municipal salaries are exempt from the Cap Law. Nor has anyone suggested that the salaries negotiated for under *N. J. S. A.* 34:13A–1 are exempt.

The provisions of *N. J. S. A.* 34:13A–14 *et seq.* do not prohibit but encourage voluntary resolution of the matters at issue. Even under *N. J. S. A.* 34:13A–16(f)(3), where compulsory arbitration has started, it is provided:

> Throughout formal arbitration proceedings the chosen arbitrator or panel of arbitrators may mediate or assist the parties in reaching a mutually agreeable settlement.

If the arbitrator was completely successful in having the parties reach a "mutually agreeable settlement," then there would be no need for an award under 16(f)(5); hence the Cap Law would apply to such a voluntary agreement, just as it does to agreements under *N. J. S. A.* 34:13A–1 *et seq.*

To hold that awards made in compulsory arbitration are exempt would encourage parties not to settle voluntarily and thereby defeat one of the purposes of *N. J. S. A.* 34:13A–14 *et seq.* and at the same time defeat the purpose of the Cap Law. Such results lead to unreasonable, anomalous and absurd consequences. This the courts should avoid where a construction leading to reasonable results consistent with the purposes of the statute is possible. See *Union Cty. Bd. of Freeholders v. Union Cty. Park Comm'n,* 41 *N. J.* 333, 341 (1964); *Elizabeth Federal S. & L. Ass'n v. Howell,* 24 *N. J.* 488, 507–508 (1957).

Further, as noted above, East Orange was under a duty to provide paid police and fire protection before the effective date of the Cap Law. If the Legislature desired to exempt such salaries, it would have done so by explicit language.

This court does not regard the deletion of subparagraph (i) from § 16(g) by the Assembly as significant. At most, it removed an impossible task from an arbitrator. Considering the interplay of *N. J. S. A.* 34:13A–16(b) and (d) and 5.4(e), the PERC rules, the Local Budget Law and the Cap Law, the court concludes that the Legislature intended the governing bodies and the taxpayers to resolve the problem of assigning priorities and cutbacks to meet the 5% limit within the framework of the traditional budget process. The Legislature directed the arbitrator to take into account financial ability to pay, among other factors, in reaching a just and fair award.

The court concludes that the Cap Law applies to awards under the compulsory arbitration provision of *N. J. S. A.* 34:13A–16 as well as to voluntary settlements.

The court must now consider whether East Orange may lawfully pay the award. East Orange contends that it expects a shortfall of $1,100,000 in the $2,300,000 of anticipated collection of delinquent taxes. Although the court notes that East Orange had collected $1,171,000 as of September 30, 1978, and anticipates only collecting $29,000 more in the next three months, the court accepts these numbers for analytical purposes. This account in its budget, as well as in all municipal budgets, is treated correctly as an anticipated revenue from other than current property taxes. It is treated as collections on accounts receivable. To the extent that delinquent taxes are not collected, it may contribute to a cash deficit. If this results, then the deficiency is exempt from the Cap Law under *N. J. S. A.* 40A:4–45.3(e). If there is no cash deficit, the fact that it was not collected does not affect the Cap limit of the next year. The Cap limit is based on the aggregate of apppropriations, and this account is not an appropriation account but rather in the nature of a revenue account. The court concludes that it will not affect the 1979 Cap limit.

The court does not have enough detail in respect to the $560,000 of real estate taxes which have been invalidated

to be certain how that will affect the budget. Sheet 18 of the 1978 budget shows that in 1977, $240,495 was appropriated to pay a charge for taxes cancelled by the State Division of Tax Appeals. It also shows that this was paid in 1977.

*N. J. S. A.* 54:3–27.1 requires that a taxpayer pay the first three-quarters of any taxes he appeals. *N. J. S. A.* 54:3–27.2 provides that a municipality must refund excess taxes with 5% interest if the appeal is sustained. If the refund is made from current year's taxes, it will have two effects. The percentage of current year collections will be reduced and thus compel an increase in the percentage of uncollected taxes used to establish the reserve for uncollected taxes. *N. J. S. A.* 40A:4–40 and Budget Manual of Division of Local Government. This increase is exempt from the Cap limit. *N. J. S. A.* 40A:4–45.3(f). Such a decrease in revenue may also contribute to a cash deficit. Funds to cover a cash deficit are also exempt from the Cap limit. *N. J. S. A.* 40A:4–45.3(e).

To the extent that East Orange is suggesting that such taxes may relate to prior years and therefore should be treated as bills for such years for which there are no appropriations or reserves, then East Orange will have to include that amount in the 1979 budget and in those appropriations which the court understands will affect the amount available under the Cap limit.

In respect to the loss of federal revenues to fund personnel under the Public Works Employment Act of 1976, those revenues are not included within the Cap limit under *N. J. S. A.* 40A:4–45.3(b). The difficult question for the governing body and the taxpayers, and more particularly for the affected employees, is how their services can be maintained. That requires local determination if Congress does not reenact the Public Works Employment Act.

The court finds that the large dollar amounts just mentioned will have a severe impact upon the East Orange budget

but not as much impact on the Cap limit and computations as suggested by East Orange.

The court has reviewed the award of the arbitrator carefully. No one contends that, in and of itself, it is excessive or that it fails to show that the arbitrator did not give consideration to each of the factors in *N. J. S. A.* 34:13A–16(g).

The court concludes that the arbitrator did not ignore the law. For reasons heretofore stated, the court concludes that the Legislature did not place the burden of compliance of the Cap Law upon arbitrators but upon governing bodies and public citizens and hence to remand the case to the arbitrator would be to compel him to make a determination which the law does not require. The court concludes that the award was not procured by undue means.

The court therefore concludes that the award should be affirmed.

The court finds that the exigencies created by the enactment of *L.* 1977, *c.* 85, are responsible in part for the time and manner in which negotiations took place and the award was made. On the facts of this case the court concludes that the legislative policies will be furthered by having the award funded through an emergency appropriation, if necessary. *In re Salaries for Probation Officers of Bergen Cty.,* 58 *N. J.* 422 (1971). The court notes that there was $236,201 appropriated for salary increases which were unallocated. The court has not been advised that such funds have been committed.[1]

---

[1]East Orange has postulated that the effect of this decision may be that there can be no raises to other employees. Technically, those matters are not before the court for decision. Practically, a court should consider the problem in fashioning a remedy consistent with legislative policy. Although the emergency appropriation statute, *N. J. S. A.* 40A:4–46, does not contain the 3% limit in *N. J. S. A.* 40A:4–45.3(c), the latter will permit 3% of approximately $20,000,000 to be raised by emergency appropriations which are outside the Cap limit.

The court observed that if the arbitrator's award had been available before adoption of the budget in 1978, the members of the governing body could have determined to cut other services, reduced the number of policemen, or submit to the voters, via a referendum, the question of raising taxes, *N. J. S. A.* 40A:4–45.3(i), or chosen some combination of all three alternatives.

The effect of this decision is to require those difficult problems to be faced in 1979.

The court need not consider here which sanctions should be employed by the courts to see that the guidelines set forth in the law and in regulations of PERC are followed in order to dovetail with the Local Budget Law.

 This court believes that the administrative agencies, PERC and Division of Local Government, should first address the problem. It recommends that the Legislature consider the problem as well.

Request for counsel fees by counsel for PBA is denied on grounds that no statute or rule of court authorizes it.

No costs.

---

Undoubtedly East Orange is correct in stating that it will have a difficult time in 1979. But if costs of government are to be held down, then difficult choices will have to be made. The Legislature has set the framework for these choices to be made at the local level with the ability of the electorate to raise taxes to provide for essential services if necessary. There is no violation of the concept of the implicit premise of local government, *Robinson v. Cahill,* 62 *N. J.* 473, 500–01 (1973) ; *Bonnet v. State,* 141 *N. J. Super.* 177, 269 *passim* (Law Div. 1976), *aff'd,* 155 *N. J. Super.* 520 (App. Div. 1978), aff'd summarily 78 *N. J.* 325 (1978), for the electorate can raise the amount of taxes to meet essential services outside the Cap Law if they vote to do so, *N. J. S. A.* 40A:4–45.3(i), and the Director has authority to issue the necessary regulations, *Op. Atty. Gen. N. J.* #3 (1977), see *id.* at 12, and has done so.